## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHARON AMATI and** | ) |
| **JANICE FINNEGAN,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 04-1442** |
| | ) |
| **UNITED STATES STEEL** | ) |
| **CORPORATION,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

COHILL, D.J.

Plaintiffs Sharon Amati and Janice Finegan have filed claims against their employer,
United States Steel Corporation ("USS") alleging sexual harassment and retaliation in violation of
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and
corresponding violations of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951 *et
seq.* Plaintiffs also allege that Defendant violated 42 U.S.C. § 1981 (a), which provides for
damages in cases of intentional employment discrimination.

Before the Court is Defendant's motion for summary judgment on all counts of the
complaint, with memorandum of law. (Doc. 40). Plaintiffs have filed a brief in opposition (Doc.
55), to which Defendant has replied (Doc. 65).

We have jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, and
supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367.

Having considered the submissions of the parties and the applicable law, for the reasons set
forth below, summary judgment will be granted in favor of the Defendant and against both
Plaintiffs on all claims.

## I. Background

Sharon Amati and Janice Finnegan allege sexual harassment by the same USS manager,
Willie Chapman, Jr. Plaintiffs' allegations of retaliation are against different managers. On

summary judgment, we must take the facts in the light most favorable to the Plaintiffs and draw all inferences in their favor. Unless otherwise indicated, we have taken the undisputed facts as stated in Defendant's concise statements of material facts ("FF" or "AF") and in Plaintiffs' individual responses to these statements ("FRFF" or "ARAF").

## A. USS Mon Valley Works

USS is an integrated steel manufacturer, and produces finished and semi-finished steel products from raw materials. (Finnegan Fact 1 ("FF1"). Plaintiffs were employed at the Mon Valley Works, which consists of four plants in Pennsylvania: Clairton, Edgar Thomson (ET), Irvin, and Fairless. (FF2).

To briefly summarize the relevant facts, the steel manufacturing process at the Mon Valley Works begins at ET, where iron ore, coke, and other raw materials are heated in a blast furnace to temperatures of 1,600 degrees C. The resultant molten steel is cast in large molds to form thick slabs that are then cooled, cut, and transported to Irvin for finishing into flat-rolled sheet products. (FF3). At Irvin, the slabs are charged into one of five furnaces, heated to more than 2,300 degrees F, and then moved to the Hot Strip Mill where they are continuously rolled into bar about one inch thick. (FF4). The bar is cropped, descaled, and immediately rolled to a long, thin strip and wound into a hot band or coil. (FF5).

At the Pickle Lines, the coils are welded into longer lengths, placed on a pass line, and put through a "pickling process," a closely controlled acid bath to remove impurities. (FF6). At the end of the Pickle Lines, the strip is recoiled to exact coil size per customer order. The coils then go to a tandem mill, where they are rolled into steel strip to the exact thickness specified by the customer. (FF7).

In the Cold Reduction Mill, cylindrical rolls are used to thin and flatten the metal. These work rolls are made of solid metal, and weigh two to four tons each. They wear easily and must be changed and repaired frequently. Most of this repair is done in the Roll Shop. Rolls are moved through the Roll Shop by overhead crane. (FF8-11).

2

After the Cold Mill, most of the coils go through an annealing process that makes the metal both strong and pliable, and then to sheet finishing facilities. (FF12).

All of these areas are accessible to one another without going outside the buildings; the Cold Mill and the Roll Shop are approximately 200 to 300 feet from the Pickle Lines. (FF13).

The Irvin plant operates 24 hours a day, seven days a week, for twenty-one turns, or shifts, weekly. Crews work rotating shifts. During the relevant time period, Irvin employed more than 1,000 union-represented employees. Process leaders are management employees who work rotating shifts and supervise the union work force. They report to the Senior Process Leader of the department. (FF14-16). On July 1, 2001, Jon Olszewski became the Senior Process Leader of the Pickle Lines, which consists of the 84-inch and 64-inch pickle lines, and the Raw Coil Storage. Scott Buckiso was the Senior Process Leader for the Cold Reduction Department, which consists of the Cold Mill and the Roll Shop. (FF17). In May 2003, Olszewski was promoted to Senior Process Leader for the Cold Mill and Pickle Lines. He remained in that position until he transferred on June 1, 2004. (FF18, 19).

## B. Labor Agreements

At all times relevant to this lawsuit, Finnegan and Amati were members of the United Steelworkers of America ("USWA") Local 2227, which represents the Production and Maintenance workers in the areas in which the Plaintiffs worked. (FF20, AF6).

The terms and conditions for employment for Production and Maintenance workers at the Mon Valley Works were governed by the Agreement between USS, a division of USX Corporation, and the USWA, Production and Maintenance Employees, August 1, 1999, and subsequently by the agreement between USS and the USWA, May 20, 2003 (the "U.S.Steel-USW Basic Labor Agreement" or "BLA"). (FF21).

The BLA includes provisions on the following: the company's exclusive right to manage the business and direct the working forces; grievance and arbitration; discipline and discharges; hours of work, seniority, and continuous service; a prohibition against discrimination against

3

employees because of race, color, religious creed, national origin, citizenship, handicap, or sex; and various safety and health provisions, including provisions regarding alcohol and drug abuse.

The BLA also provides for a Joint Civil Rights Committee, comprised of an equal number of union and management representatives, who review and investigate matters involving civil rights. (FF22). The Joint Civil Rights Committee at the Irvin Plant investigates civil rights complaints reported by Production and Maintenance employees, including complaints about alleged employment discrimination. (FF23). The BLA provides that this committee's operations and procedures shall not displace any other right or remedy. (Finnegan Response to FF23 ("FRFF23").

Under the BLA, a civil rights complaint must be brought within thirty (30) days of the date on which the employee knew or should have known of the facts giving rising to the complaint. When discipline is issued, or if an employee believes that the terms and conditions of the BLA have been violated, the first step is an informal meeting with union representatives, the disciplined or otherwise aggrieved employee, and management. If the matter cannot be resolved at the first step, a written grievance may be filed and a second-step hearing conducted. At this hearing, management presents its reasons for the action it took, and the union presents reasons why discipline should not be enforced or why USS should stop the complained-about conduct. (FF24- 26).

If the grievance remains unsolved, the process moves to the third step. Thereafter, the union has the discretion to appeal a grievance to arbitration. The International USWA, rather than the local union, represents grievants in the third step and at arbitration. (FF27).

Amati was aware of the terms and conditions of the BLA, received copies of the contract, and has a copy of the 2003 BLA. (AF8). Finnegan, too, is familiar with and has received a copy of the current BLA. (FF21 n.6).

## C. USS Sexual Harassment Policy

USS has policies in place that prohibit discrimination and establish procedures for

4

employees to follow if they believe they have been subjected to discrimination.

USS Policy 5003 prohibits sexual harassment. Policy 5003 provides that "management, at all levels, is responsible for affirmatively assuring that no employee or applicant for employment is ever subjected to any form of sexual harassment." (Def.'s Ex. 5).

USS regularly distributes copies of Policy 5003 and any revisions, and trains its employees regarding the Policy. (FF48). Finnegan was aware of the sexual harassment policy, had received a copy, read it, and received training on it. (FF49). Amati, too, was aware of the USS policy prohibiting sexual harassment, received a copy and read it, and was trained in the policy. She kept copies in her office files in case anyone at the Pickle Lines needed it. (AF9, 10).

Policy 5003 provides that an employee who believes that she has been subjected to sexual harassment must promptly report such events, and establishes a procedure for making such a complaint. Finnegan was aware of the complaint procedure. (FF50, 51).

USS Policy 5004 prohibits discriminatory harassment. Finnegan was aware of this policy, and she had received and read it. (FF52, 53). Policy 5004 provides that an employee who believes that she has been subjected to an act of discriminatory harassment must promptly report it, and provides a procedure to make such a complaint. Finnegan was aware of the complaint procedure. (FF54, 55).

Amati was also aware that the USS policy requires an employee who believes she has been subjected to sexual harassment to report it promptly, and provides a procedure to make such a complaint. (AF11). Before November 2003, Amati never reported any conduct she considered to be sexual harassment. (AF12).

## D. Willie Chapman's Employment at USS

Both Amati and Finnegan allege that they were sexually harassed by Willie Chapman.

Chapman started with USS on October 27, 1997 as a bargaining unit employee at the Edgar Thompson plant. On October 1, 2000, he was promoted to Process Leader - LMF Pits, a management position. In that position, he reported to Olszewski. On August 1, 2002, Chapman

5

transferred to the Irvin Plant, as a Process Leader in the Pickle Lines. Olszewski encouraged Chapman to transfer to Irvin, to increase Chapman's career opportunities at USS. (AF28).

Although Chapman was a supervisor in this new position, he had no direct supervisory authority over Amati at that time. (AF23-28).

In July 2003, Chapman was promoted to Production Coordinator for the Pickle Lines, and he remained in that position at all times relevant to this lawsuit. His duties included scheduling and production for the 84-inch and 64-inch Pickle Lines and the Raw Coil Storage area. (AF30).

### E. Janice Finnegan's Employment at USS

Finnegan began working for USS in 1978 at Clairton, where she worked as a burner until a layoff in 1981. On September 10, 1990, Finnegan was recalled to work at USS, and assigned to Irvin as a crane operator in the Cold Mill in the HPH Annealing Department. (FF28,29).

Several years later, Finnegan successfully bid for a job as crane operator in the Cold Mill in the Cold Reduction Department. Since then, she has worked at various jobs in progressively higher job classes, including stocker, tractor operator, roll hand, feeder coiler, strip finisher, and assistant roller. (FF30). Finnegan's present job title is "assistant roller" and her position name is "Opt Tech II." (FRFF31). In that position, she checks each strand to ensure optimum roll balance, water, and other conditions to keep the desired shape for the rolled steel. (FF31). Depending on the shift she is working, Finnegan could come under the supervision of any one of several process leaders, and she testified that she has been supervised by a number of different individuals including Ed Bengier, Chuck Lawson, Harry Rutherford, Jason Murphy, Ron Ferchak, and John Trainer. (FF32; FRFF32).

### Finegan's Position with Local 2227

From May or June 2003 until October 2003, Finnegan was the assistant grievance committee person for Local 222 for the Cold Reduction Department. She was appointed to this position by the elected grievance committee person ("griever") and was appointed acting griever when he retired in October 2003. Finnegan then won a special election to complete his term.

6

(FF36-37).

As griever, Finnegan was responsible for Zone 2 at Irvin, which consisted of the Cold Mill, Annealing, and Pickle Lines departments. Zone 2 is the largest zone in the plant, and has over 300 union employes. (FRFF38). Finnegan usually has an assistant griever for each department; however, the assistant for the Pickle Lines resigned and the other two assistants cover the Pickle Lines if Finnegan is not available. (FF39). At all relevant times, Peter Janicki was president of Local 2227, and John Guy was chair of the grievance committee. (FF40).

The griever fields complaints from employees, meets informally and formally with the senior process leaders regarding matters that have either resulted in formal discipline or that may result in formal discipline, prepares formal written grievances, and prepares the grievance form, also called a pink sheet. The griever also accompanies employees who have been summoned to meet with USS representatives to discuss possible disciplinary action. (FF41).

Finnegan tries to resolve complaints informally first by talking to the employee; then she arranges a meeting with the process leader involved. She does not approach this meeting as an adversarial proceeding; at times the facts are not in favor of the complaining employee, but there are also times when the company will have to concede the merit of the complaint. (FF44). If, after meeting with the process leader, Finnegan determines to proceed with the complaint, she meets with the senior process leader who decides whether or not to settle the complaint. (FF44). If the complaint cannot be settled, Finnegan prepares the grievance form. (FF45).

As a union official, Finnegan often conducts union business during her regularly scheduled shift. The union pays her for this "lost time." Each pay period, Finnegan prepares a time sheet with her lost time and gives it and her pay stub to the union. Finnegan averages approximately eight hours each week of lost time, although some weeks she may not take any time off. When she is going to be on union business during a scheduled work shift, Finnegan reports it to the process leader and another employee covers her position. (FF46-47).

**Finnegan's Contact with Chapman**

7

Beginning in July 2003, Chapman was the Production Coordinator for the Continuous Pickling Department. He was a management employee, whose responsibilities included production and supervision in his department. (FF56). John J. McCluskey, Manager of Employee Relations at the Mon Valley Works, testified that he spoke with Chapman after a meeting with the crews he supervised, about being sure that he was scheduling and providing training in accordance with the BLA. In McCluskey's opinion, Chapman's foremen were not performing some of their own supervisory functions, and Chapman was their "hitman" – doing that work for them. He told Chapman to "ease up on control and make the foremen perform their functions (.)" (McCluskey Dep. at 16-17).

Finnegan herself never worked at the Pickle Lines, and Chapman was never her supervisor. (FF 57; Finnegan Dep. Def.'s Ex. 1 at 47, 147). She testified that, as a griever, there are times where she will "cover the pickle line." (Def.'s Ex. 1 at 47). Although the complaint names him as her supervisor, she testified at her deposition that this was an error, and that she has never been supervised by Chapman. (Def.'s Ex. 1 at 146-47).

Finnegan first met Chapman in early October 2003, when she became the acting griever for Zone 2. (FF58). Chapman called Finnegan to inform her that he was taking an employee off a job and assigning him to another, and Finnegan, as acting griever, was to be present when Chapman explained the new assignment. (FF60). After the meeting ended and the employee left, Finnegan remained in Chapman's office. Chapman told Finnegan that he wanted to speak with her about another employee; when she asked who, Chapman said "Give me a minute and I'll think of one." (FF62). The discussion moved to the operations of the Pickle Lines, and Chapman explained the difference between good welds and bad welds. He had prints on his desk depicting these, and he asked Finnegan to come around the desk to a chair next to him so that he could explain better. She stayed where she was. (FF63).

This action did not make her uncomfortable, but she did think Chapman was flirting with her and told friends so that night. She did nothing further. (FF64).

8

After that first meeting in October 2003, Finnegan and Chapman had contact by telephone once a week or less; none of those conversations made her feel uncomfortable. (FF65). She scheduled an in-person meeting with Chapman for November 6 to sign grievances. (FF66). As she was on her way to his office, she met Chapman in an area inside the mill known as Highway One, a roadway connecting several buildings at Irvin that house, among other things, the Pickle Lines and the Cold Mill. (FF67).

Chapman told Finnegan that he knew she was there because he could feel her presence; she said he also told her she was glowing. (FF68). At that time, Finnegan did not believe Chapman's comments violated Defendant's sexual harassment policy. (Def.'s Ex. 1 at 83). They continued on to his office. He asked her if she was married, and she replied, "No, but you are." (FF71). Finnegan testified that this was an uncomfortable question. (Def.'s Ex. 1 at 86).

Chapman's office was at the top of a metal staircase. When they reached the bottom of the steps, she testified that Chapman said "You go first, that way I can look at your butt." (FF 72, 73). According to Chapman, he said "I might as well walk behind the ass I have to kiss." (Chapman Dep., Pl.'s Ex 1 at 50-51). In the office Chapman asked Finnegan if she was bringing beer to a rally being held the next day, saying that "when you drink beer, a lot of flirting goes on; we can settle a lot of grievances that way." (FF74). She thought that Chapman was talking in a joking manner about drinking beer, though she said his "voice changed" when he talked about settling grievances, and she did not think this was a "joking matter." (FF75, 76; Def.'s Ex. 1 at 89).

Finnegan changed the conversation to exercise. Chapman talked about his martial arts black belt and how he could hurt people. She did not perceive this as a direct threat, but it made her uncomfortable and she again changed the subject. (FF77).

Finnegan was uncomfortable during the meeting because of the combination of comments Chapman made, beginning with the comments when they met on Highway One. (FF79). The meeting lasted between 20 and 30 minutes; about 15 minutes were spent on the grievances. (FF79).

9

Immediately after leaving Chapman's office, Finnegan went to the office of Krista Marcin, Staff Supervisor-Employee Relations at Irvin, on an unrelated subject. She said nothing about Chapman's comments to Marcin, or to John McCluskey, Manager of Employee Relations for the Mon Valley Works, who was also present. (FF80).

She did mention Chapman's comments to Pete Janicky, president of Local 2227, the next morning, November 7. He and Ross McClelland, Local 2227's contract coordinator, suggested that they all speak to McClusky about the incident. (FF81). They did so that same day, and Finnegan told him about the comments. (FF82).

Also on the morning of November 7, Chapman and Finnegan discussed a work-related issue by telephone. Chapman asked if she was smoking a cigarette; she said she was, and Chapman said he could hear that she was smoking by the way she was breathing. (FF83). Chapman then told her that he liked their relationship the way it was and wanted to keep it that way; Finnegan was not sure what Chapman meant. (FF84).

Finnegan had no further contact with Chapman after November 7, 2003. (FF85).

### F. Amati's Employment at USS

Plaintiff Sharon Amati began working for USS at Irvin on March 20, 2000 as a weigher at the 84-inch Pickle Line. The weigher records scale weight and gauge and assigns numbers for the produced coils, and transports them to transfer cars that take them to the next destinations. (AF2, 5).

The Mon Valley Works has a total quality management system, the APEX Quality System. One of its programs, Continuous Improvement ("CI") aims to find ways to continually improve the operation, elicits suggestions, and forms teams to develop projects to implement suggestions. (AF13, 14). Teams comprise both union and management employees. A CI Coordinator ("CIC") is a bargaining unit employee who elicits suggestions, facilitates team meetings, and encourages team participation. (AF15).

Amati applied and was selected for the CIC position for the Pickle Lines. She kept her

10

position on the 84-inch Pickle Line. The CIC works Monday through Friday on a steady daylight shift. (AF16-18). The Pickle Line CIC works in the "CI trailer," a modular structure located near the Pickle Lines. In addition to the CIC office, the trailer contains large and small conference rooms, a commons area, and rest rooms. (AF21).

As of July 1, 2001, Amati reported directly to Olszewski, Senior Process Leader for the Pickle Lines, in her job as CIC. She also attended quality meetings at the Cold Mill if Olszewski was not available and a quality problem on the Pickle Line affected the Cold Mill. (AF19, 20).

On October 28, 2002, Amati was the successful bidder for the position of operator on the 64-inch Pickle Line. She continued in the CIC position. She also occasionally worked as a burner or training feeder on the 64-inch Pickle Line. (AF22). She remained in the CIC position until September 29, 2003, when she transferred to the Cold Reduction Mill Roll Shop ("Roll Shop"). (AF23).

That transfer came about in the following way: under the BLA, when a permanent vacancy develops, USS posts a notice. Employees who wish to apply for the position typically sign a bid sheet, and management determines the seniority dates and places them on the bid sheet. (AF37).

Amati signed a bid for a utility position in the Roll Shop on January 23, 2001, more than two years before the events giving rise to this complaint. She signed bids for other areas of the plant in order to have opportunities to gain more experience. (AF38). In the summer of 2003, the Roll Shop had several openings for bargaining unit employees. A number of Pickle Lines' employees, like Amati, had previously signed bids to transfer to the Roll Shop. The Pickle Lines had lost several employees to other departments after the 2003 BLA went into effect in May of 2003. Olszewski was concerned that he would continue to lose employees, and asked Labor Relatiolns at the Irvin plant whether he could retain these employees. A question also arose regarding which bid sheets would be used, as some, including Amati's, were several years old. (AF39, 40).

Complaints regarding employee bidding and transfer rights are subject to the complaint and

11

grievance procedure in the BLA. (AF41).

Olszewski learned that the employees had to be given the opportunity to transfer to the Roll Shop if they were eligible, and he complied with the BLA. (AF42).

Amati was among the employees who transferred to the Roll Shop during a two-month period in the late summer and early fall of 2003. She signed her transfer on September 23, and reported to work at the roll shop on September 29, 2003. When she accepted this transfer, Amati was told that she would not have the right to return to her former position. (AF, ARAF 101). Amati took a decrease in her hourly wage when she transferred, and she was scheduled to work shifts, including the occasional weekend, rather than the steady daylight weekday hours she worked as the CIC. However, the Roll Shop position offered incentives that provided her with the opportunity to earn more money than she made as CIC. (AF45).

Depending on the shift she was working, Amati could be supervised by one of several managers at the Roll Shop. Process Leaders Rutherford, Murphy, Piekut, Lawson and vicing foreman Trainer all reported to Ed Bengier, who was operating coordinator for the Cold Mill and the Roll Shop. They had responsibility for the Roll Shop in addition to their duties in the Cold Mill. From late 2003 to March 2, 2004, Murphy directly supervised the Roll Shop. (AF50). Five bargaining unit employees would be on a typical shift in the Roll Shop: two grinders, two crane operator/roll handlers, also called chockers, and a blaster. (AF53).

Amati's first job at the Roll Shop was chocker; she later trained and worked as a grinder. (AF54-55).

On September 26, before leaving her job as CIC, Amati sent an e-mail to McCluskey and Olszewski, explaining her reasons for leaving the CI job. She stated that she and Olszewski had "no relationship at all including communication," but added that she had "no ill feelings towards anybody." (ARAF 46; Def.'s Ex. 23).

Amati has been off work since August 1, 2004, due to an injury. Before she left work, Amati had not lost any bonuses, insurance, benefits, or pay increases. Her petition for Workers'

12

Compensation is currently being litigated. (AF142-143).

## Amati's Contact with Chapman

After he was promoted to Production Coordinator for the Pickle Lines in July 2003, Chapman had direct supervisory authority over Amati and the other employees on the Pickle Lines. (AF29, Def.'s Ex. 42).

He went to the CI trailer, where Amati had her office, each morning for the operations meeting in the large conference room. Four process leaders reported directly to Chapman. Each morning, Olszewski and Chapman met with the process leaders from the preceding shifts and discussed production results and requirements for the day. The meeting usually began around 7:30 a.m., and lasted half an hour. It was attended by approximately ten people, including Amati. (AF31, 33-34).

Chapman also went to Amati's office to see the progress of CI projects, review graphs, and schedule meetings. (AF35).

In addition, Chapman occasionally stopped at the trailer during the shift to check on Ray Michel's progress with various assignments. (AF36). After Michel, a Pickle Lines employee, was injured on June 18, 2003, Chapman assigned him to sedentary work in the CI trailer, where he worked in the small conference room directly next door to Amati's office. (AF32)

In her EEOC complaint, Amati alleges the following conduct: beginning in January 2003, Chapman began talking to her about his physical strength and demonstrating martial arts holds; on May 5, Chapman asked her about her previous sexual encounters and sexual fantasies; Chapman told her she was "beautiful," "sexy," and "voluptuous" while he was in her office, and stared at her breasts while she was walking by; Chapman "smirked" at her during meetings; Chapman made comments she believed were intimidating. (AF77-81).

On June 2, Chapman entered her office and asked her if she wanted to have an affair. He then asked her to perform oral sex on him. He pulled his chair over and began rubbing the inside of her thigh, grabbed her breast, and tried to kiss her. Chapman then pulled out his penis and told

13

her to perform oral sex. (AF82). Amati later testified that the incident happened in June, but she was unsure of the date. (AF83).

Michel, who was working next door to Amati's office, testified that he saw her run from her office after the incident, "upset and crying," and saw Chapman follow her out. He believed the incident happened in August. He further testified that Amati asked him to sit in her office when Chapman came to see her, because he scared her, and that Chapman came into her office every day. (ARAF82).

When he learned Amati had bid on a transfer to the Roll Shop, Chapman said "You are not leaving me." (AF85). A week or so later he again told Amati he thought they should have an affair. (AF86).

Chapman did not tell Amati that he would discipline her if she did not cooperate, and he could not give her a less favorable job or fire her. (AF89-90). She transferred to the Roll Shop on September 23, 2003. (AF 23).

### G. Plaintiffs' Civil Rights Complaints and USS Investigation

On November 7, 2003, Finnegan and Amati each filed a Civil Rights Complaint with the USWA alleging sexual harassment by Willie Chapman.

Amati's complaint alleged unwanted sexual comments and physical contact. She reported that Chapman had grabbed her breasts, kissed her, and exposed his penis. (AF57-58).

Amati's complaint was untimely under the BLA, which requires a complaint within 30 days of the date on which the employee knew or should have known of the conduct. (AF62).

Finnegan filed a Civil Rights Complaint with the USWA on November 7, the day she first reported Chapman's conduct, alleging sexual harassment. (FF86).

Finnegan's complaint alleges:

> from October 1 til [sic] present a foreman, Willie Chapman has made unwanted sexual comments to Ms. Finnegan. On numerous occasions Mr. Chapman has made sexual and intimidating remarks during grievance procedures.
>
> In Ms. Finnegan position [sic] as grievance person she must come

14

> into contact with Mr. Chapman daily. His unwanted comments has [sic] made it uncomfortable as well as difficult to perform her grievance work.

(FF87; Def.'s Ex. 7).

Lou Ann Grice, Guy, and Janicki represented Local 2227 on the Joint Civil Rights Committee at Irvin. Preston Henderson and Marcin represented the company. (FF88). On November 10, Finnegan and Amati met with Marcin and Henderson about their allegations against Chapman. Finnegan described only the remarks about going up the steps and drinking beer, and not the remark about her smoking. Amati reported that Chapman had made sexual advances to her, made suggestive comments, touched her inappropriately, asked her to have an affair with him, and exposed himself on one occasion. She could not state with certainty when the conduct occurred. Marcin took notes, but did not write down every word. (ARAF60). Henderson promised the women that an investigation would be conducted, and that he would let them know the results. He said that USS does not tolerate sexual harassment. (AF61; FF89).

The following day, McCluskey, Henderson, and Marcin advised Chapman of the allegations. Chapman said he was shocked, and didn't know how to respond. (FF90; AF64; Chapman Dep. Def.'s Ex. 33 at 49). McCluskey advised Chapman that an investigation would begin, and Henderson advised him about the prohibition against retaliation and said he should have no contact with the two women. (FF91).

During the investigation, Marcin and Henderson interviewed six other employees whom Amati had identified. Finnegan did not identify any employees who might have information regarding her allegations. Marcin and Henderson concluded that those interviewed were not witnesses to any alleged harassment by Chapman. (AF66; FF92). Grice separately interviewed the same employees. (AF67; F93). Grice and Finnegan also spoke to several women who worked at the Pickle Lines, and learned that none had experienced any problems with or harassment by Chapman. (AF68; FF94). During the course of the investigation Marcin and Henderson also looked into a rumor that Chapman had engaged in sexually harassing conduct prior to his transfer

15

to Irvin; they determined that this information was false. (AF69; FF95).

USS concluded that there was no evidence, beyond Finnegan's and Amati's own statements, that Chapman had engaged in the alleged behavior. Chapman denied the allegations, and Amati had waited a considerable amount of time before making her complaint. (AF68). Henderson met with Grice and Finnegan to discuss the outcome of the investigation on either December 2 or 3, 2003, and told them that there were no independent witnesses for the allegations. Finnegan testified that Henderson also told her she would not have to deal with Chapman any more in processing grievances, and she should take all grievances to the Senior Process leader. (FF96). She has done so since that time. (FF97).

McCluskey stated that he found the investigation inconclusive. (Def.'s Ex. 32 at 7).

Chapman was reinstructed on the USS policy prohibiting sexual harassment and retaliation. Chapman would have no further contact with either woman. By this time, Amati had transferred to a position in the Cold Reduction Roll Shop, and would no longer have any contact with Chapman. Finnegan would not be required to have contact with him in her position as griever. (AF71; FF99).

## H. Plaintiffs' Grievances

Plaintiffs' civil rights complaints were not resolved to their satisfaction, and the union filed a grievance on behalf of both Finnegan and Amati on December 8, 2003. (AF72; FF100-101;App. Ex. 1, 8).

Finnegan attended both the second- and third-step meetings regarding the grievance pursuant to the procedure in the 2003 BLA. During these steps, the union states its position on the grievance and may present evidence in support, and management states its position and responds to the union's arguments. (FF102-103). Their grievances were denied.

At the union's request, McCluskey met with representatives of the USWA International, Janicki, Guy, Marcin, as well as Finnegan and Amati, on December 19, 2003, to discuss the information obtained during the investigation. (AF74; FF105-106). The USWA representatives requested that Chapman be removed from his job and away from the bargaining unit employees

16

until the grievance was resolved; USS did not accept this proposal. (FF107). Finnegan would continue to deal with the Senior Process Leader instead of Chapman for grievances. Chapman was reinstructed on USS sexual harassment policies. (FF108).

The USWA International appealed the denial of the grievance to the Board of Arbitration. That appeal was pending when motions for summary judgment were filed in this case. (AF72-73; FF104).

## I. Plaintiffs' EEOC Charges

### Finnegan's First EEOC Charge (Sexual Harassment)

Finnegan filed a charge of sex discrimination with the EEOC on January 9, 2004, asking that it be cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). (FF109; Def.'s Ex. 10). USS received notice of the charge on January 18, 2004. (FF110).

In her charge, Finnegan stated that she had knowledge of Chapman harassing another woman, and she has testified that this statement refers to Sharon Amati's allegations. (FF112). She reiterated her allegations of sexual harassment, and also alleged that, by not placing her on special assignment, USS retaliated against her for complaining about Chapman. (FF112-113).

Soon after Finnegan became the griever in October 2003, she requested a move to a steady day light job; she thought she would be more effective as a griever if she was available during daylight hours. (FRFF 114). Olszewski stated that he rejected that request because it would not ease the difficulty of backfilling her position when she was absent for union business. (Def.'s Ex. 45, Olszewski Aff. at ¶ 26). Finnigan stated that Ed Bengier told her that "Johnny O (Olszewski) had stated 'That girl will never get any special assignment.'" (Def.'s Ex. 1 at 127). He also asked Finnegan "what did you do to piss Johnny O off." (Def.'s Ex. 1 at 128).

The statement in Finnegan's first EEOC charge that Olszewski "was told not to place me on special assignment" is not correct. (FF118). Finnegan did not file a grievance about not receiving the special assignment. (FF119).

The EEOC issued a Dismissal and Notice of Rights on June 23, 2004. (FF120).

17

**Amati's First EEOC Charge (Sexual Harassment)**

On or about December 23, 2003, Amati filed a charge of sex discrimination with the EEOC, asking that it be cross-filed with the PHRC. USS received notice of the charge on December 29. (AF75-76).

Amati's allegations of harassment include the conduct mentioned above: beginning in January 2003, Chapman began talking to her about his physical strength and demonstrating martial arts holds; on May 5, Chapman asked her about her previous sexual encounters and sexual fantasies; Chapman told her she was "beautiful," "sexy," and "voluptuous" while he was in her office, and stared at her breasts while she was walking by; Chapman "smirked" at her during meetings; Chapman made comments she believed were intimidating. (AF77-81).

On June 2, Chapman entered her office and asked her if she wanted to have an affair. He then asked her to perform oral sex on him. He pulled his chair over and began rubbing the inside of her thigh, grabbed her breast, and tried to kiss her. Chapman then pulled out his penis and told her to perform oral sex. (AF82). Amati later testified that the incident happened in June, but she was unsure of the date. (AF83).

When he learned Amati had bid on a transfer to the Roll Shop, Chapman said "You are not leaving me." (AF85). A week or so later he again told Amati he thought they should have an affair. (AF86).

The EEOC issued a dismissal and Notice of Rights on June 23, 2004. (Def.'s Ex. 44).

**Finnegan's Second EEOC Charge (Retaliation)**

Finnegan filed a second charge with the EEOC and PHRC after March 24, 2004. In that charge, Finnegan alleged that USS retaliated against her for filing the first EEOC charge by making it "very hard for me to do my union business. My phone calls, pages and messages are never returned and this results in time limits on grievances to lapse." (FF121, Def.'s Ex. 44). USS received notice of this charge on April 8, 2994. (FF122).

Finnegan testified that Olszewski would not return her phone calls, pages, and messages.

18

She testified that 80% of her phone calls were not returned. She complained of this to the union president. (Def.'s Ex. 1 at 134-135).

She began keeping a log of these calls and messages, but discontinued it. (Def.'s Ex. 1 at 136). The chair of the grievance committee had no knowledge of any grievance in which time limits had lapsed due to Olszewski's alleged actions, and USS has no such knowledge. (FF125).

The second EEOC charge further alleged that USS "has done nothing to avoid Mr. Chapman being in attendance with regard to the resolution of the complaint of sexual harassment against him. In other words, the company has done nothing to isolate Mr. Chapman from [Finnegan and Amati]." (FF126; Ex. 12). During the company's investigation USS offered Finnegan several alternatives to presenting grievances to Chapman, including presenting them to Olszewski or to one of the supervisors at the Pickle Lines. (FF127). USS states that it never agreed that Chapman would not be present at any meeting regarding a grievance from the Pickle Lines, and the BLA permits his attendance at any such meetings. (Def.'s Ex. 44, Henderson Aff, at ¶ 11).

At one or two meetings regarding an employee under Chapman's supervision, Finnegan requested that John Guy attend with her, and he did. (FF129).

For the past two years, Chapman has attended meetings regarding grievances where Finnegan was present. (FF130). She contends that this constitutes adverse employment action and retaliation.

The EEOC issued a Dismissal and Notice of Rights letter on June 23, 2004. (FF131; Def.'s Ex. 14).

## Amati's Second EEOC Charge (Retaliation)

Amati filed a second charge with the EEOC and PHRC on March 3, 2004, alleging unlawful retaliation. (AF92). USS received notice of the charge on March 13, 2004.

The charge includes the following allegations of retaliation: On December 19, 2003, Amati attended a meeting about the civil rights complaint with the union and McCluskey, and the next

19

day Jason Murphy questioned her about where she had been; McCluskey told her she had been reported by R.L. Smith, Safety Coordinator for the union. (AF97-100).

When she signed her bid to go to the roll shop in September 2003, she was not given 30 days to transfer back to her old job; Amati testified that she would not have wanted to go back to working with Chapman, but that this was retaliation. (AF101-103).

Amati had been given quality auditor training as a CIC; however, when she left that position she was given no additional training despite the fact that she indicated her continued interest. USS has explained that she was not scheduled because she was no longer in the CIC position. (AF104-107). Chapman stared at her in a hostile manner, and USS had said that he was to have no contact with her. (ARAF108-109).

Her paycheck was shorted by four days (32 hours) in December 2003. USS explains that the error was for a week when she was scheduled to attend training, but her name did not appear on the schedule and therefore was not entered into the computerized pay system. A number of other employees were also inadvertently shorted that month. Murphy determined that this was a mistake, and Piekut corrected the error. (AF110-112). Errors in pay are usually corrected in the next scheduled paycheck. Olszewski directed Murphy to prepare an advance and told Amati she would have the check the next day. However, Murphy had never prepared an advance before, and there was a delay processing the check. He received it on December 31, 2003, and gave it to her the following day. She describes her efforts to correct this as an "ordeal" and testified that Murphy smirked at her as he handed her the check. She does not know whether Murphy knew she had filed a complaint against Chapman; neither she nor anyone else told him. (AF113-122; ARAF 114). She left a phone message about Murphy with McCluskey, but she did not file a grievance. (AF 123-124).

Amati was not paid for the time she spent undergoing a physical examination. Employees are regularly scheduled for examinations, and those who do not attend are placed on a delinquent list which is sent to managers. Amati's name appeared on such a list in early January, 2004.

20

Murphy instructed her to complete the physical, and she did. When she complained that she had not been paid for that day, Murphy filed an inquiry and the matter was corrected. Amati did not file a grievance about this matter. (AF125-130).

Murphy was unaware that Amati had filed any charges of sexual harassment, and no one has ever complained to him about harassment from Chapman. (AF131). Henderson and Marcin met with Olszewski, Murphy, and Chapman to discuss Amati's charge of retaliation. At that meeting, Henderson reinforced USS's policy against sexual harassment and retaliation, and provided copies of USS Policy 5003. (AF132).

## J. Plaintiffs' Additional Retaliation Claims

As part of the complaint in this action, both Finnegan and Amati have averred additional acts of retaliation.

### Finnegan's Additional Allegations of Retaliation

Finnegan felt threatened and intimidated because she had to see Chapman everyday when she went to her locker, which was by the Pickle Line office, and he looked and leered at her. (FF132). She did not file any grievances or otherwise report this behavior to USS management. (FF133). Union officials have advised her to "grow thicker skin." (FRFF133).

In the fall of 2004, she was not given a flashlight as soon as the men in her department got one. (FF134). She did not complain to anyone about this. (FF135).

Process Leader Piekut brings men their work gloves every week but forgets hers, which are a smaller size. She did not complain or file a grievance, but went to the office and got bundles of gloves to store in her locker. (FF136-136).

Piekut does not tell her about roll changes before they occur, even though "they go tell the men what is going on and they don't tell me." (FRFF138). She has neither complained about this nor filed a grievance. (FF139). She does not know whether Piekut was aware that she had filed complaints of sexual harassment against Chapman. (FF140).

It took "a while" for Finnegan to be trained as an assistant roller, and she says younger

21

employees were trained before she was. She received that training in April 2004. (FF141). She believes Olszewski was responsible for the delay, since he decides who will be trained. (FRFF142). Finnegan did not complain to anyone, including Olszewski, about this, and did not file a grievance on the issue. (FF143).

## Amati's Additional Allegations of Retaliation

Amati was scheduled to train for her new job as a grinder on overtime. When she complained, Murphy said it was because they were shorthanded. After she complained, the overtime scheduling stopped. (AF133-134).

Amati was locked out of the plant in February 2004, and she believes this was in retaliation for her claims. Employees may enter the Irvin plant without their security cards by using their social security numbers. This method may be used four times, but after that the employee will be denied access. When she changed jobs she no longer drove into the plant as she had done when she was a CIC. When she was locked out, she had been using her social security number to enter, as she didn't want to take her purse with her. After she contacted Labor Relations about the problem, Charlene Roberts explained why Amati had been locked out and resolved the problem. (AF135-141).

## II. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1989). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court considering summary judgment must examine the entire record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). The court must not engage in credibility determinations at the

22

summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (*quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

The moving party bears the initial responsibility for demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. This burden may be met by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. However, once the moving party has properly supported its motion, the opponent must provide some evidence that a question of material fact remains for trial. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the non-moving party may not rest upon mere allegations, general denials, or vague statements. *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993). The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita*, 475 U.S. at 486. In other words, the non-moving party must go beyond the pleadings and show, through its own affidavits or by the depositions, answers to interrogatories and admissions on file, the specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Employer liability under the PHRA follows the standards set out for employer liability under Title VII. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n. 5 (3d Cir.1997). Thus, we will analyze Plaintiffs' claims only under Title VII below; however, the analysis and conclusions are equally applicable to claims of discrimination in violation of the PHRA.

## III. Analysis

### A. Counts I and IV: Hostile Environment

To set forth a prima facie case of discrimination under Title VII based on a hostile work environment, a plaintiff must establish the following:

> (1) the employee suffered intentional discrimination because of sex;
> (2) the discrimination was pervasive or severe; (3) the discrimination
> detrimentally affected the plaintiff; (4) the discrimination would
> detrimentally affect a reasonable person of the same sex in that
> position; and (5) the existence of respondeat superior liability.

*Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997) (citing *Andrews v. City of*

23

*Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)); *Jensen v. Potter*, 435 F.3d 444, 449 n. 3 (3d Cir. 2006), *overruled in part on other grounds by Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006). [1]

The standards for determining whether workplace conditions create a hostile environment are demanding, so as "to ensure that Title VII does not become a 'general civility' code." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). When considering claims of sexual harassment, the Supreme Court has reminded us that "'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discriminat[ion] . .. because of . . . sex.'" *Faragher*, 524 U.S. at 788 (citing *Oncale*, 523 U.S. at 81).

Moreover, Title VII is only violated where the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65); *Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir. 1999).

In determining whether an environment is hostile or abusive we must examine the totality of the circumstances. These may include the frequency and severity of the conduct, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with the victim's work performance. *Faragher*, 524 U.S. at 787 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). "Conduct must be extreme to amount to a change in the terms and conditions of employment (.)" *Faragher*, 524 U.S. at 788. Harassment is pervasive when "incidents of harassment occur either in concert or with regularity."

---

[1]

The "pervasive and regular" requirement set forth by the Third Circuit in *Andrews* conflicted with the standard in *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986), wherein the Supreme Court advised that the alleged discriminatory conduct must be "pervasive or severe." The Third Circuit recently adopted the Supreme Court's standard. *Jensen v. Potter*, 435 F.3d 444, 449 n. 3 (3d Cir. 2006), *overruled in part on other grounds by Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006).

*Andrews*, 895 F.2d at 1484.

As to employer liability, the Supreme Court has distinguished between the conduct of a supervisor and that of a fellow employee. An employer is generally liable for the conduct of a supervisory employee whose actions have created a hostile work environment for a subordinate. However, if no tangible employment action has been taken against the employee, the employer can avoid liability by asserting an affirmative defense showing that it "(a) exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b), and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 805 (1998); *Ellerth*, 524 U.S. at 765.

A tangible employment action is "a significant change in employment status," which may include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Suders v. Easton*, 325 F.3d 432, 434 (3d Cir. 2003) (quoting *Ellerth*, 524 U.S. at 761).

To establish employer liability when a coworker's conduct is at issue, a plaintiff must prove that the employer knew or should have known about the harassment, but failed to take prompt remedial action. *Andreoli v. Gates*, 482 F.3d 641, 648 (3d Cir. 2007) (citing *Jenson*, 435 F.3d at 452-53).

With these legal principles in mind, we turn to the Plaintiffs' individual hostile environment claims.

## Counts I and IV: Finnegan's Hostile Environment Claim

Finnegan's hostile environment claims are based on the following: Chapman's conduct after the October 2003 meeting, where he flirted with the Plaintiff by pulling up chair and asking that she sit next to him while he explained welds; Chapman's comments on November 6, 2003 about following her butt and drinking beer, and his comment over the phone on November 7 that he could tell she was smoking because of her breathing.

25

Defendant argues that the conduct complained of does not establish conduct sufficiently severe or pervasive to violate Title VII, and we agree.

Finnegan herself testified that the October 2003 comments did not make her feel uncomfortable. Chapman's comments on November 6 did make her uncomfortable, but, even if they were crude and boorish, they don't rise to the level of conduct that violates Title VII. Furthermore, although Finnegan met with the staff supervisor of employee relations on an unrelated matter directly after leaving Chapman's office, she was not disturbed enough to mention it. We find that three instances of conduct such as this are neither severe nor pervasive conduct. Finnegan was not threatened or humiliated, and there is absolutely no evidence that Chapman's conduct affected her job performance. Finnegan has failed to establish this element of her hostile environment claim.

Nor are there facts from which a reasonable jury could find a basis for employer liability for any of Chapman's actions toward Finnegan, because USS took prompt, immediate action after Finnegan first complained about Chapman on November 7. Plaintiff's argument that there is a disputed issue of fact as to whether Chapman had "successively higher" authority over her is unsupported by the record. There are no facts to show that Chapman had any authority to hire, fire, or discipline her, or to alter her work schedule or otherwise affect her job. Although Finnegan had contact with Chapman in her position as a griever for the union, it is undisputed that he was not her supervisor and had no supervisory authority over her.

Thus the legal standard for this element of her claim is whether the employer knew or should have known about the alleged harassing conduct by a coworker and failed to take remedial action. Finnegan's insistence that USS failed to do so simply has no basis in the record. The undisputed facts show that she told her union president about Chapman on November 7, and he arranged a meeting that same day with John McCluskey, manager of employee relations at the Mon Valley works. Both Plaintiffs filed a civil rights complaint with the USWA on November 7, and both Plaintiffs met with Marcin and Henderson regarding their allegations on November 10.

Henderson promised to investigate, and he, McCluskey, and Marcin met with Chapman the next day, told him that the matter was being investigated, reminded him of the prohibition against retaliation, and told him to have no further contact with either woman.

Not only was the investigation promptly undertaken, it was thorough. Although Finnegan did not identify any witnesses, the company investigated each of the individuals Amati named and found no witnesses to Chapman's behavior. Rumors that Chapman had engaged in sexually harassing conduct at his previous plant were also investigated, and found to be without merit. After the investigation, Henderson again met with Finnegan and told her she should take all grievances to the Senior Process leader instead of to Chapman, to avoid further contact with him.

Finnegan insists that Defendant's actions were not remedial because she had been told that she would not have to "deal with Willie Chapman at all" and she encountered him at one or two grievance meetings. However, the record shows that in those instances, USS advised Finnegan that Chapman would be present because he was involved in the employment action at issue. Finnegan chose not to send one of her assistant grievers to those meetings, although she did arrange for another individual to accompany her. There is no evidence that Chapman's behavior at these meetings was in any way inappropriate. We conclude that his presence at one or two meetings, which Finnegan chose to attend despite knowing he would be present, and where nothing untoward occurred, does not provide a basis for employer liability under Title VII. She has failed to establish this element of her claim.

We find that Finnegan has failed to state a claim of hostile environment. Since no material facts remain in dispute for trial, we will grant summary judgment in favor of the Defendant and dismiss the complaint as to this claim for this Plaintiff.

**Counts I and IV: Amati's Hostile Environment Claim**

As evidence that she worked in a sexually hostile environment while employed by USS, Amati asserts that Willie Chapman subjected her to unwanted physical contact, including martial arts holds, grabbing her breasts, rubbing her thighs, and hugging her; attempted to kiss her; asked

27

her about sexual encounters and fantasies; told her he found her physically attractive; repeatedly said they should have an affair; said she was "not leaving him" to obtain another position; stared at her breasts; and exposed his penis and told her to perform oral sex. (Compl. at ¶ 23).

Defendant argues that summary judgment is proper on this claim because Chapman's conduct was not severe or pervasive enough to constitute sexual harassment. To support its position, Defendant directs us to *Durkin v. Chicago*, 199 F.Supp.2d 836 (N.D.Ill. 2002) and *Jones v. Clinton*, 990 F.Supp. 657 (E.D.Ark. 1998), for the proposition that a single instance of exposing oneself is not severe enough to be actionable sexual harassment. These cases are not binding authority, and we do not find them persuasive on the facts of this case. Considering the totality of the circumstances of this case, these instances of unwanted conduct satisfy the threshold of severe or pervasive conduct for a sexual harassment claim. A reasonable jury could find that Chapman's conduct escalated from what could be regarded as merely stray remarks to unwanted physically threatening conduct, and culminated in the humiliating experience of Chapman exposing himself and demanding oral sex. Although the Defendant insists that Chapman's actions did not affect the terms and conditions of Amati's employment, the testimony of co-worker Michel that Amati asked him to sit in her office when Chapman came to see her because she was scared, and that Chapman went to Amati's office in the CIC trailer every day, is evidence that the conditions of her daily work were affected by Chapman's behavior.

However, we agree with the Defendant that there is no basis for employer liability in this case, and thus Amati has failed to establish the final element of her claim.

Plaintiff insists that we must find respondeat superior liability because Chapman was a supervisory employee when he harassed Amati. However, as Defendant correctly points out, he was not a supervisor with immediate or successively higher authority over Amati during most of the events underlying her complaint of sexual harassment, and Plaintiff has failed to indicate specific facts from which to conclude otherwise. Beginning July 1, 2001, Amati's supervisor in her position as CIC on the Pickle Lines was senior process leader Olszewski. (AF 19). After Chapman transferred to the Irvin Plant on August 1, 2002, Amati and Chapman were simply

28

coworkers until he became production coordinator of the Pickle lines in July 2003. He had direct supervisory authority over Amati only from July 2003 until she transferred to the Roll Shop on September 29, 2003.

The complaint alleges that misconduct began in January 2003, and although Amati was sometimes uncertain as to exact dates the record shows that the specific events complained of most likely occurred before July 2003. In May, Chapman asked about her sexual encounters and fantasies, told her she was beautiful, sexy, and voluptuous, and stared at her breasts. Amati testified that the incident in her office, in which Chapman rubbed her thigh, attempted to kiss her, exposed himself, and demanded oral sex took place on June 2. The timing of these events indicates that they occurred while Amati and Chapman were coworkers. An employer is liable for the sexually harassing conduct of a coworker only if the employer knew or should have known about the harassment, but failed to take prompt remedial action. *Andreoli*, 492 F.3d at 648. It is undisputed that Amati did not inform USS of Chapman's conduct until November 7, 2003. Therefore, there is no basis for finding the Defendant liable for any sexually harassing conduct before that date.

Plaintiff argues that McCluskey's comment that Chapman often performed supervisory jobs that should have been left to his foremen establishes that he had some supervisory authority over Amati, but we reject this speculative argument. Plaintiff points to no evidence from which we may conclude that Chapman had any ability to hire, fire, evaluate, or discipline the Plaintiff, or that he had any influence over her schedule or pay. There is no evidence that he functioned as Amati's supervisor until July 2003.

Plaintiff also points to the testimony of Ray Michel, who worked in the small conference room next door to Amati's office in the CI trailer beginning in late June, 2003. Michel testified that he thought the exposure incident happened in August, which would be after Chapman became Amati's supervisor. Michel saw her run from her office after the incident, "upset and crying, and saw Chapman follow her out. (ARAF 82). However, even if this creates a disputed issue of fact as to when the alleged incident took place, that simply changes Defendant's burden of proof but does not defeat summary judgment.

29

The analysis for whether an employer is vicariously liable for the conduct of plaintiff's supervisor is set forth by the Supreme Court in *Ellerth* and *Faragher*. *Ellerth*, 524 U.S. 742; *Faragher*, 524 U.S. 775. Under these cases, the threshold question for vicarious liability is whether the supervisor's harassment resulted in a tangible employment action. If no tangible employment action has been taken, the employer may raise an affirmative defense to liability by showing that it had exercised reasonable care to avoid the harassment and that the employee had failed to take advantage of these safeguards. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 805.

Plaintiff asserts that "[t]he 'tangible job action' claim is utterly without merit," and that Defendant's claim that Amati suffered no tangible job action is unfounded. (Pls.' Br. at 10), but does not point to any facts from which we might conclude that there was a tangible job action. The record shows that she was not fired, constructively discharged, or denied a promotion or salary increase. Her job duties were not reassigned, nor was her schedule changed. The only change in employment status was her transfer to the Roll Shop on September 29, 2003, which was a transfer to a position she had actively sought and bid on two years previously. This transfer did significantly change her schedule from working only during daylight weekday hours as a CIC to working on shifts and the occasional weekend, and she was paid less per hour, but there is nothing in the record to indicate that this transfer was anything but voluntary. Indeed, Amati bid on this position to gain more experience at USS, and incentives at the Roll Shop provided the potential for her to actually earn more than she had as a CIC. There is no evidence from which to find that Amati suffered a tangible job action. Thus if Chapman was Amati's supervisor during any of the conduct complained of, USS is entitled to raise the *Ellerth/Faragher* employer defense to liability for the conduct of a supervisor. Plaintiff's position that the defense "does not apply in cases of manager/supervisor harassment" is an incorrect statement of the law. (Pls.' Br. at 11). The defense is applicable where, as here, there has been no tangible job action.

In accordance with *Ellerth/Faragher* USS submits that it took reasonable care to prevent and correct promptly any sexually harassing behavior, and that Amati unreasonably failed to take advantage of preventive or corrective opportunities.

30

Under the BLA, an employee who claims sexual harassment must bring a civil rights complaint within 30 days of the facts giving rise to the complaint. Similarly, USS, through its anti-discrimination policies, has established a procedure for making a complaint and employees are expected to promptly report such events. Amati was aware of these policies and procedures, and had received training on them. It is undisputed that Amati did not bring her complaint within this time period. She unreasonably failed to take advantage of the corrective measures USS had in place.

Once informed of Plaintiff's claims on November 7, USS acted promptly. On November 10, Marcin and Henderson met with the Plaintiffs, and Henderson told them that an investigation would be conducted. McCluskey, Henderson, and Marcin met with Chapman the following day, informed him of the complaints, and told him that an investigation would be made. They also reminded him of the policy against retaliation, and advised him that he should have no contact with the Plaintiffs. During the course of its investigation, the company interviewed each witness Amati proposed, and investigated rumors that Chapman had been accused of similar conduct before transferring to the Irvin Plant. These rumors proved groundless. Ultimately, USS found no corroboration for Amati's claims, and informed her of this conclusion. Again, Chapman was instructed on the USS policy on sexual harassment, and reminded not to contact Amati. She had transferred to the Roll Shop before filing her complaint, and her new position did not bring her into contact with Chapman.

We conclude that through its policies, USS took reasonable care to prevent and correct harassment. By failing to promptly report Chapman's conduct, Amati unreasonably failed to take advantage of the procedures USS had in place. Moreover, after Amati did bring the situation to the company's attention, USS acted promptly, meeting with the Plaintiffs three days later, informing Chapman of the allegations and instructing him to have no contact with the Plaintiffs, and conducting a thorough investigation. Plaintiff has not pointed to any facts from which a reasonable jury could conclude otherwise.

Amati has failed to establish that USS is liable for Chapman's conduct: if that conduct

31

occurred before he became her supervisor, USS is not liable because Amati did not report it; if that conduct occurred after he became her supervisor, there was no tangible job action and USS has prevailed on the *Ellerth/Faragher* defense. Accordingly, as no disputed issues of material fact remain for trial, we will grant summary judgment as a matter of law for USS on Amati's sexual harassment claims.

## B. Count II: Retaliation

Count II alleges that Defendant retaliated against Amati and Finnegan for complaining about sexual harassment and discrimination. (Compl. at ¶¶ 46, 47).

Section 704 of Title VII provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge . . . under this subchapter.

42 U.S.C. § 2000e-3(a).

On summary judgment, a retaliation claim is analyzed in three burden-shifting stages. The plaintiff must first establish a prima facie case of unlawful retaliation. If she is successful, the defendant has the opportunity to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant satisfies this burden, to defeat summary judgment the plaintiff must point to specific facts from which a jury could find that the proffered reason is a pretext for discrimination. *Jones v. School District of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973)).

## Prima Facie Case

To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001).

With respect to the first element, an employee does not need to prove that the conduct about which she is complaining is actually in violation of anti-discrimination laws; rather, she only

32

has to have a good faith, reasonable belief that the complained of conduct was unlawful. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir.1996). It is undisputed that filing a charge with the EEOC constitutes protected activity under Title VII. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997).

With regard to the second element, the Supreme Court has recently emphasized that the anti-retaliation provision does not protect an individual from all retaliation, but only "from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Railway Co.*, 126 S.Ct. 2405, 2414 (2006). The scope of the statute may extend beyond workplace-related or employment-related retaliatory acts and harm. *Id.* To succeed on a retaliation claim, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse (.)" *Id.* at 2415. The Court stressed that "it is important to separate significant from trivial harms" and concluded that a materially adverse action might be one that "dissuade[s] a reasonable worker from making or supporting a charge of discrimination." *Id.* quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1217-1218 (C.A. D.C. 2006).

Reiterating that Title VII does not set forth "a general civility code for the American workplace(,)" the Court emphasized that the anti-retaliation provision of the statute "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Id.* at 2415, quoting *Oncale*, 523 U.S. at 80; *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Thus, for example, "personality conflicts at work" and "'snubbing by supervisors and co-workers' are not actionable under § 704(a)." *Burlington Northern*, 126 S.Ct. at 2415, quoting B. Lindemann & P. Grossman, Employment Discrimination Law 660 (3d ed. 1996).

Courts are reminded that "context matters" in assessing a retaliation claim, and that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington Northern*, 126 S.Ct. at 2415.

Put another way, retaliation focuses on "the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position," and "not the underlying conduct that forms the basis of the Title VII complaint." *Id.* at 2416.

33

Finally, to establish the third prong of a retaliation claim and defeat a motion for summary judgment, a plaintiff must point to evidence from which a reasonable fact finder could find a causal connection between the protected activity and the materially adverse action. In this jurisdiction, temporal proximity between the protected act and the alleged retaliation is sufficient to create an inference of causation for the purposes of establishing plaintiff's prima facie case. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). The timing of the adverse action, however, must be "unusually suggestive" of retaliatory motive. *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000). *Compare Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989) (finding causation when plaintiff was discharged two days after the employer received EEOC claim), with *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (concluding that nineteen months was too great a time span to suggest a causal connection).

However, it is well established that where temporal proximity alone cannot give rise to an inference of causation, it may be considered along with other circumstantial evidence to establish that the employer developed a "pattern of antagonism" toward the plaintiff after the protected conduct. *Farrell*, 206 F.3d at 280-81 (quoting *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).

**Finnegan has not established a claim of retaliation**

It is undisputed that Finnegan engaged in protected activity when she complained about Chapman's conduct beginning on November 7, 2003 and filed her first charge with the EEOC on January 9, 2004.

Finnegan asserts that the following actions were taken in retaliation for complaining of sexual harassment: Olszewski denied her a special assignment as a daylight tractor operator; Olzewski rarely returned her phone calls and pages; USS did not isolate Chapman from Finnegan after she complained of his conduct; she was denied a flashlight and gloves; Chapman stared at her when she went to her locker; Piekut did not tell her about roll changes at the mill; and USS delayed in training her as an assistant roller. (Pls.' Br. at 12). She contends that these were adverse actions and that they show a pattern of ongoing antagonism after she complained to the EEOC of sexual

34

harassment.

Defendant argues that these incidents are not materially adverse actions under the *Burlington Northern* standard, and we agree. These are all in the nature of trivial harms or workplace tensions and complaints, and they would not dissuade a reasonable employee from filing a complaint. Furthermore, USS has offered legitimate, non-discriminatory reasons for these actions, and Plaintiff has not met her burden of pointing to specific evidence from which a reasonable jury could find pretext.

Finnegan requested a daylight position because she thought it would make her work as a griever for the union more efficient, but there is no evidence that this was so. No harm resulted from being denied this daylight shift; indeed, she testified that she was able to go to the union hall every day and that she got the necessary work done without this position. Moreover, USS has explained that it did not give Finnegan a job as a daylight tractor operator because the company would still have to backfill her position when she was absent for union business. Finnegan has not argued that this explanation is a pretext for discrimination, as the burden-shifting framework for a retaliation claim requires her to do.

Nor is there evidence in the record to support her claim that Olszewski failed to return most of her phone calls (Finnegan estimated that he returned about 20 percent of her calls but has no records to support this assertion) in retaliation for her complaint, and that this caused time limits on grievances to lapse. This does not establish materially adverse conduct. Indeed, there was undisputed testimony from the chairman of the grievance committee that no time limits lapsed on any grievances, which indicates that no harm resulted from any unreturned phone calls.

Her complaints about Chapman fail to establish materially adverse conduct. She did not report Chapman's staring at her when she went to her locker to anyone at USS. When she told a union official about it, she was advised to "grow thicker skin" and she did not think this was a bad remark. As to Chapman not being isolated from her, Finnegan could identify only one or two meetings where they were both present, and the record shows that USS informed her in advance that he would attend; Finnegan asked John Guy to accompany her, and he did. There is no record

35

evidence that Chapman' presence at one or two meetings was in retaliation for Finnegan's complaints. Moreover, USS has offered a legitimate non-discriminatory reason for having Chapman at these meetings: under the BLA Chapman was required to attend because he was involved in the employment action that led to the grievances being discussed. Finnegan has not argued that this is a pretext for discrimination.

Neither does receiving a flashlight or work gloves after the men received them suggest materially adverse conduct; at most, these are workplace slights and not evidence from which a jury could infer retaliation. With regard to the work gloves, Finnegan did not complain about it, but instead went to the office and "got big bundles and put them in my locker so that solved the problem." (Def.'s Ex. 1 at 157). These slights caused no harm and do not rise to the level of adverse actions that violate Title VII.

Finnegan also asserts that she was trained as an assistant roller after some younger employees were trained, but the fact is that she was trained in that position, and there is nothing in the record to indicate that the order in which individuals were trained was retaliatory. She also argues that Piekut does not tell her about roll changes, although she should be made aware of such changes when they occur. Again, there is no evidence that this was in retaliation for protected conduct, or that any harm resulted from the timing of her training. Neither of these complaints constitute adverse actions for purposes of establishing a prima facie case of retaliation.

We conclude that a reasonable employee in Finnegan's position would not have felt her ability to file a complaint was compromised by any or all of this alleged behavior, and thus Finnegan has failed to establish this element of her prima facie case.

We also agree with Defendant that she has not pointed to evidence from which a reasonable jury could find causation. The evidence shows that she did not complain to her managers or file a grievance regarding any of the alleged adverse acts, and there is no evidence that her managers knew that she had complained of Chapman's behavior. There is no evidence from which a reasonable jury could conclude that any of these acts were the result of a pattern of antagonism. We conclude that Finnegan has failed to establish a prima facie case of retaliation, and, moreover,

36

that she has failed to offer any evidence from which a jury could find that Defendant's proffered reasons for its conduct were a pretext for discrimination. As no disputed issues of material fact remain for trial, we will dismiss Finnegan's retaliation claim.

## Amati has not established a claim of retaliation

It is undisputed that Amati engaged in protected activity when she complained about Chapman's conduct beginning on November 7, 2003.

Amati asserts that the following actions were taken in retaliation for complaining of sexual harassment: bad faith questioning of her whereabouts by managers who were already aware that she was attending to union business; the company's failure to offer her a 30-day return to her original position when she transferred to the Roll Shop, despite making this offer to other employees; denying her request to train as an auditor after her transfer; ongoing antagonism by Chapman; problems with the amount in her paycheck over a four-week period; and being locked out of the plant.

We agree with the Defendant that these claims are trivial harms under *Burlington Northern*, and, alone or in concert, would not dissuade a reasonable employee from reporting sexual harassment. We will address these claims in turn, noting that Amati's brief is bare-bones and conclusory on her retaliation count. She merely states that these actions "constitute adverse employment action," and asserts that causation is established because she filed a retaliation charge with the EEOC, based on these incidents, approximately two months after she filed her first EEOC charge. In addition, despite the fact that the Defendant has offered a legitimate, non-discriminatory reason for many of these actions, Amati ignores her burden to point to specific facts from which a reasonable factfinder could conclude that these reasons are a pretext for discrimination.

We turn first to the claim that Chapman continued to be antagonistic in retaliation for her complaint. Plaintiff's brief opposing summary judgment simply asserts that this is an adverse action and retaliatory, but fails to articulate any facts or argument to support her position. We assume that this refers to the fact that he stared at her in a hostile manner on December 24, 2003, which is conduct included in her EEOC Charge on retaliation. (ARAF 108-109). Amati asserts

37

that Chapman's stare violated USS's mandate that he have no contact with her, but fails to point to specific facts from which a reasonable factfinder could conclude Chapman acted in retaliation. As *Burlington Northern* reminds us, Title VII does not set forth a "civility code for the American workplace" and the anti-retaliation provision is designed to prevent employer interference with access to the remedial provisions of the statute. *Id.* at 2416. The objective standard of material adversity articulated by the Supreme Court "is tied to the alleged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id.* at 2416. One instance of this sort, though uncomfortable for this Plaintiff, does not establish material adversity and would not affect a reasonable employee's decision to report sexual harassment.

Amati was locked out of the plant in February 2004. However, USS explains and Amati does not refute that this happened because she was using her social security number to enter. She admits that when she reported the problem to Charlene Roberts at Labor Relations, Roberts explained why she had been locked out and resolved the problem. There is simply no evidence that she was locked out in retaliation for having complained of Chapman's conduct, or that this caused any injury or harm or was materially adverse so as to affect a decision to report discriminatory conduct. Furthermore, Plaintiff does not refute Defendant's proffered reason for the lockout, and admits that the company resolved the problem when she brought it to Roberts' attention.

Amati also argues that she experienced bad faith questioning of her whereabouts by managers who were already aware that she was attending to union business, and that this was retaliatory conduct. This occurred the day after she attended a meeting with McCluskey and union members about the Plaintiffs' civil rights complaints. Amati's assertions that union safety coordinator R.L. Smith had reported her to manager Jason Murphy, and that Murphy knew she was on union business, do not establish harm or injury or material adversity. USS explains that she was questioned because she had been scheduled for the daylight shift in the Roll Shop and had not followed the company's call-off procedures, and Amati points to no evidence to refute this explanation.

38

There is no evidence to support Amati's assertion that the USS failed to offer her a 30-day return to her original position when she transferred to the Roll Shop, despite making this offer to other employees, in retaliation for having filed her complaint. The timing alone belies any retaliation, since she decided to accept the terms of the transfer well before she ever reported Chapman's conduct. Moreover, Amati points to no evidence that other transferring employees were offered the right to return to their former positions, and she admits that she was advised that she would not have this right before accepting the transfer.

USS denied her request to train as an auditor after her transfer, which was prior to her notifying the company about Chapman's conduct. There is no evidence from which to find that this was material adversity, and the timing does not suggest that her request was denied because she made her complaint.

Plaintiff asserts that her paycheck was shorted in December 2003, in relation for having complained about Chapman. USS explains that this error was for a week when she was scheduled to attend a training but her name wasn't entered into the computerized pay system. A number of other employees were also affected. Although such errors are generally corrected in the next paycheck, Olszewski directed Murphy to prepare an advance and told Amati she would have the check the following day. There was a delay because Murphy had not prepared an advance before, and Amati finally received her check on January 1, 2004. This is the sort of trivial incident that does not establish retaliation under Title VII; there is no evidence that Amati was injured or harmed, and the Plaintiff was not singled out but was one of a number of employees who experienced the same aggravation. Furthermore, there is no evidence that Murphy was aware of her allegations about Chapman's conduct, and Plaintiff does not argue that USS's explanation is a pretext for discrimination.

Amati also argues that USS retaliated against her by withholding pay in early January for the time she spent having a required physical examination. USS explains and Amati admits that her name had appeared on a delinquent list of those who had not yet completed the physical; she was then directed to do so and complied. When she complained to Murphy, her supervisor, that she

39

had not been paid, Murphy immediately filed an inquiry and she was paid. There is no evidence of injury or harm from this occurrence, and no facts from which to conclude material adversity. And, again, Amati offers nothing to refute the company's legitimate, non-discriminatory reason for the incident.

We conclude that the events complained of do not show material adversity and so do not establish a claim of retaliation in this case. In addition, because USS has offered legitimate, non-discriminatory reasons for the conduct complained of and Amati has failed to point to any evidence that these reasons are a pretext for discrimination, Amati has not met her burden and cannot defeat Defendant's motion for summary judgment on this claim. There being no disputed issues of material fact remaining for trial on this issue, Count II will be dismissed as to Plaintiff Amati.

## C. Count III: 42 U.S.C. § 1981 (a)

42 U.S.C. § 1981 (a) provides, under some circumstances, for compensatory and punitive damages in cases of intentional discrimination under Title VII. As we have concluded that Plaintiffs' have failed to establish their Title VII claims, we will dismiss Count III of the complaint as to both Plaintiffs.

## IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment will be granted in its entirety, and the complaint in this matter shall be dismissed as to both Plaintiffs.

An appropriate Order follows.

November 1, 2007
Date

Maurice B. Cohill, Jr.

Maurice B. Cohill, Jr.
Senior United States District Judge

40